UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NANCY J. PASTULA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-133-B-W |
| | ) | |
| LANE CONSTRUCTION CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Nancy Pastula has filed a civil action against Lane Construction Corporation complaining of sexual harassment and whistleblower retaliation.[1]  Lane Construction Corporation has filed a motion for summary judgment against both claims.  (Docket No. 25).  I recommend that the Court grant the motion.

**Statement of Material Facts**

The following statement of facts is drawn from the parties' Local Rule 56 statements of material fact in accordance with this district's summary judgment practice. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the procedure); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining the "the spirit and purpose" of Local Rule 56).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all evidentiary disputes appropriately generated by the parties' statements have been resolved, for purposes of summary judgment only, in

---

[1]      Lane Construction Corporation removed this action from state court based upon diversity.  The original complaint was entirely framed in terms of state law.  Federal claims were added after removal in a second amended complaint (Docket No. 8)

favor of the non-movant.  <u>Merchants Ins. Co. v. United States Fid. & Guar. Co.</u>, 143 F.3d
5, 7 (1st Cir. 1998).

     Nancy Pastula began working for Lane in 2001. (Statement of Material Facts
(SMF)[2] ¶ 1.)  Pastula began work as a truck driver but by the following year she was a
heavy equipment operator driving rollers, graders, backhoes, and reclaimers. (SMF ¶ 2.)
From the time she started work until August of 2003, Pastula experienced nothing
problematic in terms of what she would consider sexual harassment.  (<u>Id.</u> ¶ 3.)  According
to Pastula, she did not even hear sexually-charged jokes being told at work.  (<u>Id.</u> ¶ 4.)
That changed in or around August of 2003 when Pastula began working on a crew in
Hancock that was overseen by Jeff Albee, then in training to become a paving foreman.
(<u>Id.</u> ¶¶ 5, 9.)  Albee frequently made statements to Pastula, to another crew member
named Dick Gardner, and to others to the effect that he thought Pastula and Gardner were
having an affair.  (<u>Id.</u> ¶ 78.)  Albee's frequent statements about Pastula and Gardner
having an affair were not true and went beyond the point of teasing.[3]  (<u>Id.</u> ¶ 79.)  Pastula
contends that Gardner complained to David Bess, the acting plant manager, and that Bess
never responded.  (<u>Id.</u> ¶ 80.)  According to Pastula, on August 4, 2003, Erin Brown, a co-
worker, brought in some pictures of an ATV ride that several Lane employees had gone

---

[2]     Because Pastula has numbered her statement of additional material facts consecutively to Lane's
statement of material facts, I simply cite to all of these documents as "SMF" because they together
comprise but one statement of the material facts in the record.  Lane's initial statement, Pastula's responsive
and additional statement, and Lane's reply statement are found, respectively, at docket numbers 26, 36 and
43.  Note that the initial statement ends at paragraph 77 and the additional statement commences at
paragraph 78.

[3]     Lane admits this statement offered by Pastula.  It is not clear what is meant by "beyond the point
of teasing."  I infer that this means the statements were offensive to Pastula and Gardner.

on the day before and Albee said to Erin,[4] "Oh, you don't have any lesbian photographs of you and your girlfriend in there." (<u>Id.</u> ¶ 87.)[5]

Sometime thereafter, but still in August of 2003, Erin Brown told Pastula that Albee told her to ask Pastula if she would "flash her tits" to the crew. (<u>Id.</u> ¶ 5.) Pastula was very surprised by Erin's remark, but thought she would just "leave it alone" because Albee had not said anything to her. (<u>Id.</u> ¶ 6.) At the end of the next day, however, Albee himself called out to her in front of the crew and told her to "flash her tits" to the crew. (<u>Id.</u> ¶ 7.) Pastula states that she shook her head and repeatedly stated, "I can't believe he said that." (<u>Id.</u> ¶ 8.) Nothing else happened that day. (<u>Id.</u> ¶ 8.) Erin acknowledges that she heard Albee state that he thought Pastula should flash the crew. (<u>Id.</u> ¶¶ 10-11.) Erin states that she, too, was asked to do it and jokingly agreed, but did not actually do it because it was a joke. (<u>Id.</u> ¶ 13.) Pastula denies ever hearing Albee direct a similar comment to Erin. (<u>Id.</u> ¶ 12.) On at least one occasion, the date of which is not provided, Albee told the entire crew that "it was going to be topless Tuesday," and the response was laughter. (<u>Id.</u> ¶ 17.) It is not clear whether the parties would have the Court infer from this statement that it occurred in conjunction with Albee's request that Pastula and/or Erin flash the crew.

The day after Albee told Pastula to flash the crew, Pastula called the office manager and told her that she did not want to be around Albee, that she wanted to be put

---

[4]        Erin Brown is now Erin Brown Peasley due to marriage. Accordingly, her deposition is referred to as the Peasley Deposition. In setting forth the statement of facts I have for the most part used Erin for clarity's sake.

[5]        In support of this statement Pastula cites, exclusively, a hand-written narrative she authored at some point in the past. In addition to denying this statement with a citation to Erin's sworn testimony, Lane objects because the narrative is not admissible, being unsworn. I overrule the objection, only because Lane itself offers the narrative as an exhibit under Federal Rule of Evidence 803(5) & (6) in responding to paragraphs 82 and 85. Parenthetically, Lane relies on a similar narrative in support of paragraph 73 of its statement.

on a different crew, and that she would like Dave Bess to come to the job site to remove Pastula from Albee's crew.  (<u>Id.</u> ¶ 21.)  Bess went to the job site and spoke with Pastula. (<u>Id.</u> ¶ 22.)  Pastula reported her version of events to Bess and Bess then spoke with Albee and Erin.  (<u>Id.</u> ¶¶ 23-24.)  Albee denied asking Pastula to expose herself to the crew.  (<u>Id.</u> ¶ 24.)  Bess had Albee, Erin, and Pastula meet with himself and others in his office in Ellsworth later that day.  (<u>Id.</u> ¶ 25.)  During the meeting Pastula repeated her request to be removed from Albee's crew.  (<u>Id.</u> ¶ 26.)  Albee stated that he never liked or trusted Pastula and that he knew she was trouble.  (<u>Id.</u> ¶ 89.)  Albee made some undisclosed remark, which Pastula says was sexist, to which Pastula replied, "That's a pretty sexist remark."  (SAMF ¶ 90.)  Lane adds that Pastula called Albee a sexist.  (<u>Id.</u>)  At the end of the meeting Albee made what Pastula believes was an insincere apology to her.  She describes it as "pretty much forced on him" by Bess.  (SMF ¶ 27.)  Bess then drove Pastula out to Machias, where another Lane road crew was working and where Pastula ran a roller for the remainder of the day.  (<u>Id.</u> ¶ 28.)  Pastula does not recall whether or not she directly told Bess that she did not want him to take her out to the Machias crew that day.  (<u>Id.</u> ¶ 31.)  Although she admits asking to be taken off Albee's crew, Pastula states that she was disappointed to be transferred to the Machias crew and thought that Albee would be relieved of his position.  Pastula states that she said words to this effect to Bess.  (<u>Id.</u> ¶¶ 31, 91.)  According to Pastula, after she reported harassment to Bess (but before the meeting took place), Bess told her that Albee would be relieved of his position for a while.  (<u>Id.</u> ¶ 88.)

        After Pastula's complaint about Albee, Bess enclosed a sexual harassment notice in the next pay envelope for all Hancock employees, a copy of which is attached as

Exhibit B to Bess's declaration.  (Id. ¶ 45.)  Also after Pastula's complaint about Albee, Bess conducted an August 8, 2003, manager's meeting with foremen, acting foremen, and others to address the issue of sexual harassment, perceptions, and proper conduct in the work environment. (Id. ¶ 46.)  Bess directed Albee to cover the topic of sexual harassment at the bi-weekly tailgate safety talk for his crew for August 11, 2003.  (Id. ¶ 47.)

*The Machias Crew and Mark and Steve Rowley*

The crew working in Machias did not have a foreman, not even an acting foreman, but only a lead person paid an hourly wage named Steve Rowley.  (Id. ¶ 29.) Pastula believed that Steve Rowley was acting as the foreman on that crew.  (Id. ¶ 29.) The crew in Machias knew of what had happened with Albee, and Mark (not Steve) Rowley, a member of this crew, told Pastula that "we're not going to have titty Tuesday, we're going to have pants down Wednesday."  (Id. ¶¶ 35, 92.)  Mark Rowley is purported to have made that comment 20 to 30 times that day.  (Id. ¶ 93.)  Every few days Mark Rowley came up with something new, such as, "It's moon us Monday," and following an event attended by the Governor, Mark Rowley asked Pastula, "Did you tell the Governor it was titty Tuesday?"  (Id. ¶¶ 35, 94.)  Pastula considered Mark Rowley to be making "smart aleck remarks" that she characterizes as "very humiliating and degrading."  (Id. ¶ 36.)

At some juncture Steve Rowley was talking to all the other guys on the crew and asking each of them in turn if he got any "skin" the previous evening, and they would all talk about their wives and "this and that," and then Steve Rowley asked Pastula whether she got any skin last night.  (Id. ¶ 38.)  Pastula said she "didn't want to be involved in

[his] conversation." (Id. ¶ 39.)  Rowley's response was, "Well, you must have got it this morning then."  (Id. ¶ 40.)  No other specifics of the Machias experience are provided, but Pastula testified that there was "always something," and that not a day would go by without someone making a crude remark.  (Id. ¶ 95.)[6]  Nearly every day Pastula was in tears over what she considered sexual harassment and she was getting very little sleep. (Id. ¶ 96.)

On August 13 or 14, 2003, David Bess and Joe Rollins went to see Pastula on a job site in Tremont and she started to break down and cry and said she couldn't talk about it,[7] that it was very hard to talk about again, and that she had quoted Erin word for word. (Id. ¶ 98.).  Pastula felt like there was no point in talking about it anymore because, in her view, Bess had not done anything about it.  (Id. ¶ 99.)

On September 2, 2003, Pastula met with Bess and Rollins again and this time told them that crude remarks were being made to her on Steve Rowley's crew.  (Id. ¶ 100.) According to Pastula she started to break down, and told Bess and Rollins that she did not seem to get anywhere when she told them about what happened with Erin Brown and Jeff Albee.  (Id. ¶ 101.)  According to Lane Construction, Bess was investigating Pastula's complaint about Albee during this time, and later on, Rowley.  (Id. ¶ 42.)  According to Pastula, the evidence demonstrates that "the only 'investigation' which was undertaken on Pastula's complaint against Jeff Albee was the meeting of August 6, 2003, and a conversation with Pastula on August 12, 2003."  (Id.)  Bess had heard of potential

---

[6]     The defendant complains that this statement is ambiguous as it is not clear whether she meant that every day someone would tease her or that every day a construction worker would make a crude remark, generally, not specifically to her, "which would not be surprising."  (Def.'s Resp. Statement ¶ 95.)  I do not draw the inference from Pastula's vague testimony that every day crude remarks were directed to her or targeted at her.
[7]     I infer that "it" means the Albee incident.

harassment by a member of the Machias crew as of August 29, 2003, shortly before the September 2 meeting.  (Id. ¶ 43.)  On September 2 Bess learned more specifically that Mark Rowley was making offensive comments to Pastula about "moon us Monday" and "titty Tuesday."  (Id. ¶ 43.)  On September 3, 2003, Pastula shared some lengthy handwritten notes with Bess that contained, among other things, her account of Steve Rowley asking the rest of the crew, including her, if they got any skin last night.  (Id. ¶ 44.)  When Bess interviewed Mark Rowley about the matter, Mark Rowley stated that he could not recall making any such statements to Pastula.  (Id. ¶¶ 70-73.)  Bess interviewed other employees, one of whom said he did hear something like "titty Tuesday."  (Id. ¶ 74.)  Steve Rowley informed Bess that his crew was "always joking around," including when Pastula was part of the crew.  (Id. ¶ 132.)  In all, Pastula worked on Steve Rowley's crew for a little over five weeks, beginning on August 6, 2003, and continuing through the first full week of September.  (Id. ¶ 37.)

As of September 12, 2003, at the latest, Bess asked Pastula to return to Albee's crew to run the roller.  (Id. ¶¶ 52, 77.)  Pastula agreed, but asserts in her summary judgment affidavit: "I had nothing to do and was afraid that if I refused the assignment, that would be used against me because there was work available that I was refusing to do."  (Id. ¶ 77; Pastula Aff. ¶ 7.)  Pastula indicated to Bess that she was a little hesitant and uncomfortable about it but would try.  (Id. ¶¶ 53, 106.)  Bess took her to the job site and put her on a back roller where she would pretty much have no contact with the other crew members.  (Id. ¶ 54.)  At the end of the day Bess picked Pastula up and asked if she had any problems and she indicated she had not.  (Id. ¶ 55.)  Bess informed Pastula that he had arranged another sexual harassment awareness and prevention training session for

September 15, 2003.  (<u>Id.</u> ¶ 56.)  After Pastula's complaint to Bess that she was being teased by Mark Rowley, Lane Construction arranged to have a team of outside attorneys give a special training session on September 15, 2003, to the Hancock employees on sexual harassment awareness and prevention. (<u>Id.</u> ¶ 48.)

Lane states that after returning to Albee's crew on September 12, 2003, Pastula had no more problems for the rest of the season and for all of 2004 with regard to sexual comments and the like.  (<u>Id.</u> ¶¶ 57, 75.)  Pastula does not deny this statement but qualifies it by noting that she was basically isolated from the rest of the crew by working the back roller and she also asserts that no one spoke to her.  (<u>Id.</u> ¶ 108.)  In fact, per Albee's request, Pastula was isolated in traveling to the job site. (<u>Id.</u> ¶¶ 57, 75, 109.)  Albee testified that although he did not speak to Pastula again, he believed that everyone else on the crew spoke to her.  (<u>Id.</u> ¶¶ 105, 108.)  Although the crew normally rides together in a crew cab, Pastula was told to arrive thirty minutes early so that she could ride with the service truck driver instead.  (<u>Id.</u> ¶¶ 57, 75, 110.)  Pastula never voiced any objection to this arrangement and she was paid for the extra half hour of her time.  (<u>Id.</u> ¶ 110.)

In December 2003, Lane Construction notified Albee that he would not continue as a foreman.  (<u>Id.</u> ¶ 58; Albee Dep. at 6.)  The parties agree that Albee returned in 2004 as a truck driver.  (SMF ¶ 58.)  Although Bess believes Albee's attempt at humor with Pastula was a lapse in professional judgment, the parties agree that there were additional performance-based reasons why Albee would not have been made a foreman regardless of what happened between him and Pastula.  (<u>Id.</u> ¶ 59.)  Pastula states that Erin was unhappy that Albee lost his position as foreman and blamed Pastula's complaints for the loss of that position on more than two occasions.  (<u>Id.</u> ¶ 103.)  The record does not

disclose any indication that Erin's displeasure was ever communicated to Pastula.  At some point Owen Powers became the new foreman of the crew.  (Id. ¶ 113.)

The parties next inform us of matters that transpired in 2005.  Parenthetically, it appears that Pastula began traveling with the crew at some point between September 2003 and 2005, although the date is not provided.  In any event, on one occasion when Pastula was traveling with the crew in June of 2005, the crew stopped at Erin's house on their way to Lane's Hancock plant from a job site.  (Id. ¶¶ 60, 112.)  People were drinking and having a good time engaging in sexually suggestive banter.  (Id. ¶ 61.)  At one point a photograph was taken of Erin with another women touching her clothed breast with both of them smiling.  (Id. ¶ 62.)  People used crude language.  (Id. ¶ 63.)  Pastula does not assert that any of this activity was directed at her, or that she was made the object of any jokes, or that she was approached or felt physically threatened in any way.  (Id. ¶ 64.)  Pastula rode from Erin's house with her foreman, Owen Powers, and another crew member, Dennis St. Peter, back to the Hancock plant.  (Id. ¶ 113.)  While they were traveling along, another foreman of the crew, Rick Whitmore, called Owen Powers on a cell phone and told him that Whitmore "was going to be the first one to fuck that girl," evidently referring to the woman in the picture with Erin.  (Id. ¶ 115.)  The parties agree that Whitmore had consumed "quite a few too many drinks."  (Id. ¶ 114.)  Powers repeated Whitmore's message to Dennis St. Peter, and Pastula felt degraded and demeaned to be sitting in the crew cab listening to them laughing about the crude statement.  (Id. ¶ 116.)[8]  Pastula called Dave Bess the day after that transpired and asked him to please remove her from the crew, but that did not happen and she had no choice

---

[8]      The defendant qualifies this statement by arguing that the cited deposition testimony does not support the contention that anyone was laughing at Pastula or the situation she was in; I have not drawn such an inference on her behalf.

but to continue working with that crew.  (Id. ¶ 117.)  There is no indication that she reported to Bess any of the activity that had upset her.  (Id.)  In any event, sometime later in the summer of 2005 Bess asked Pastula if she would go to work in Bangor and she agreed.  (Id. ¶¶ 66, 118.)  Since that transfer Pastula has been very happy working for Lane, and she admits that Lane respects her for her work and that the move to Bangor worked out well.  (Id. ¶ 67.)

### Reports by Other Lane Employees

There is no dispute that Walter Moore witnessed the incident in which Jeff Albee asked Nancy Pastula to "flash her tits."  (Id. ¶ 83.)  Although Moore did not say anything to Albee at the time, he did send an e-mail to Lane's public relations person, Dale Leone, and told him what happened, but did not give him Albee's name.  (Id. ¶ 84.)  Moore told Leone that Albee's behavior did not comply with Lane's zero tolerance policy on sexual harassment.  (Id. ¶ 85.)[9] Leone responded to Moore's e-mail with a request to "name names," and Moore provided Jeff Albee's name in a responding e-mail, but Mr. Moore never heard back from Mr. Leone.  (Id. ¶ 86.)

Dick Gardner—the employee whom Albee made statements about to the effect that he was having an affair with Pastula—also e-mailed the corporate office in Meriden, Connecticut, with information about the harassment and reminded them that the promotion of Jeff Albee was not in line with the zero tolerance policy.  (Id. ¶ 81.)[10]

Rod Gillespie is a union representative who spoke with Nancy Pastula and a more than one official at Lane Construction regarding sexual harassment.  (Id. ¶ 125.)  Pastula

---

[9]     The defendant qualifies this statement by acknowledging that Moore wrote this but stating that this is not evidence that Lane violated its zero tolerance policy.  (Def.'s Resp. SAMF ¶ 85.)
[10]     Lane qualifies this statement with the observation that Gardner's affidavit is evidence of what he wrote in the e-mail but not evidence that what he wrote was true.  (Def.'s Resp. SAMF ¶ 81.)

reported "the sexual harassment incident" involving Jeff Albee to Gillespie on August 10, 2003.  (<u>Id.</u> ¶ 126.)[11]  Gillespie contacted Frank Healy, a supervisor at Lane Construction on August 12, 2003, and conveyed that information to him and voiced his concerns, and Healy assured Gillespie that he would check into it.  (<u>Id.</u> ¶ 127.)  Pastula reported to Gillespie on August 25, 2003, that she was losing hours at work because they had moved her to a different crew and that because of the reduction in hours, it was affecting her income.  She requested that Gillespie speak to Scott Leach.  (<u>Id.</u> ¶ 128.)[12]  Gillespie relayed that assertion to Scott Leach on August 27, 2003, who told Gillespie he would investigate.  (<u>Id.</u> ¶ 129.)  Gillespie spoke with David Bess, the supervisor at the Hancock plant, about Pastula's concerns, although he is uncertain of the date of that conversation. (<u>Id.</u> ¶ 130.)

<em>Facts relating to Lane's Sexual Harassment Policy</em>

Lane Construction sent out a memorandum on sexual harassment to its employees on August 6, 2003, warning, "Individuals who violate this policy are subject to immediate discipline ranging from written warning up to and including discharge or other appropriate sanctions."  (<u>Id.</u> ¶ 119.)  Lane Construction's sexual harassment policy provides that "The Lane Construction Corporation will not tolerate sexual harassment." (<u>Id.</u> ¶ 120.)  Its policy instructs supervisors who have observed or are approached about sexual harassment to do the following:

> Advise the person who was offended of his or her right to seek help
> through the compliance officer.  Advise the offending person to stop
> immediately.  If the offender is a supervisor, report it immediately to the

---

[11]    It is apparent that "the incident" refers to the "flash your tits" statement that Albee made to Pastula.  The defendant denies the statements of facts in paragraphs 125 and 126 to the extent that they imply a legal conclusion that there was any unlawful sexual harassment.

[12]    The defendant admits that Pastula said this to Gillespie but insists that this is not evidence of the truth of her assertion about losing income.

compliance officer and encourage the recipient to do the same. . . . Take
responsibility to see that sexual harassment are [sic] stopped and that there
is no reprisal.

(Id. ¶ 121.)  Additional excerpts highlighted by Pastula provide as follows:

Individuals who violate this policy are subject to immediate discipline
ranging from written warning up to and including discharge or other
appropriate sanctions.

Where sexual harassment is found to have occurred, The Lane
Construction Corporation will act to stop the harassment, act to prevent its
recurrence, and discipline those responsible.

Any employee of The Lane Construction Corporation who believes that
they have been sexually harassed should contact their supervisor
immediately. This claim can be addressed informally to your immediate
supervisor.

(Id. ¶¶ 122-124.)  (Pl.'s SAMF ¶ 124; Def.'s Resp. SAMF ¶ 124.)

Lane asserts that all Hancock crew members and foremen receive specific

instruction regarding sexual harassment upon rehiring in the spring of each year.  The

instruction includes the viewing of a video entitled "Sexual Harassment Prevention,

Training, and Education Package for Maine."  (Id. ¶ 51.)  Pastula counters that when she

was hired by Lane Construction she was required to watch a video regarding sexual

harassment prevention but that during the four years she worked on the Hancock crew

she did not recall being required to watch the video again.   (Id.)  There is no dispute

between the parties that all Lane employees are also made aware of Lane's general,

seven-page policy against sexual harassment, which explains complaint procedures.  (Id.)

Pastula asserts, citing the affidavit of Gardner, that it is not uncommon for a Lane

policy to be written and for education to be provided as to the policy, only to have the

company fail to follow the policy, such as the "Zero Tolerance Policy" or their

"Operating Under Influence" policy.  (Id. ¶ 82; Gardner Aff. ¶ 7.)  Lane denies this

assertion, citing a host of record evidence including the following: Pastula's acknowledgement that there were sexual harassment courses (Pastula Dep. at 54-55) and a letter sent out with employee paychecks following her complaints (id. at 58); a tailgate safety talk "follow-up memo" dated August 11, 2003, and signed by Albee as foreman, indicating that sexual harassment was discussed (Bess Decl. Ex. D); a memorandum for a September 15, 2003, sexual harassment awareness and prevention training session presented by two attorneys (Bess Decl. Ex. E); handwritten notes by Pastula indicating that she was informed that Lane was going to have a special meeting on sexual harassment from an outside source (Pastula Dep. Ex. 3); Pastula's acknowledgement that Bess and Leach met with her in September to ascertain whether anything new had transpired (Pastula Dep. at 78-79) and her acknowledgement that she did not experience any problems after September 15, 2003, during the remainder of 2003, or during the entirety of 2004 (id. at 84); Bess's report that he met with Albee after work on August 6, 2003, and warned him verbally that as the leader of the crew he was responsible for assuring that these situations did not happened (Bess Decl ¶ 7); Bess's and Albee's testimony that Albee was relieved of his foreman responsibility for performance issues which included his involvement with the Pastula matter (id.; Albee Dep. at 6, 46); and Pastula's testimony that she was satisfied with her subsequent placement on a Bangor-based crew (Pastula Dep. at 86-87).

*Pay Differential?*

For the nine week period prior to being moved on August 6, 2003, from Jeff Albee's crew to Steve Rowley's crew, Pastula earned an average weekly wage of $1330.36. (SMF ¶ 133.) Over the following five-to-six-week period that she worked on

Steve Rowley's crew, before returning to Albee's crew, Pastula earned an average weekly wage of $1073.33 per week.  (Id. ¶ 134.)  There is no direct evidence in the record to enable the Court to compare the hours Pastula worked each week on Steve Rowley's crew with the hours worked by Albee's crew during that same period.

### Discussion

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. of N.H., Inc. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

Pastula's second amended complaint includes two counts:  one for sexual harassment in the form of a hostile work environment, brought under the Maine Human Rights Act and Title VII of the federal Civil Rights Act, and one seeking damages for alleged retaliation, brought exclusively under the Maine Whistleblowers' Protection Act. Lane moves for summary judgment on both counts and, in the event it is not successful on one or both of the counts, also seeks summary judgment on Pastula's claim for punitive damages, arguing that there is no evidence that it acted with malice or reckless indifference.  I address each claim in turn.

A.      **Sexual Harassment/Hostile Work Environment**

In her first count Pastula contends she was subjected to sexual harassment in the form of a hostile work environment in violation of the Maine Human Rights Act, 5 M.R.S.A. § 4572, and Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000e-2. (Second Am. Compl. ¶¶ 6-11.)  Pastula's hostile work environment claim requires proof that she was subjected to harassment in the workplace based upon sex and that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create a work environment that was both objectively and subjectively hostile or abusive.  O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998), Harris v. Forklift Systems, Inc., 510 U.S. 17, 20-23 (1993), and Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-73 (1986)); see also Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 n.2 (1st Cir. 1999) (observing that "courts typically apply Title VII standards to claims of sexual harassment under the MHRA").  The critical issue is whether Pastula was exposed

to "disadvantageous terms of employment to which members of the other sex [were] not exposed." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

Lane argues that Pastula cannot carry the burden of proving the existence of a hostile work environment because no reasonable factfinder could fairly conclude that the harassment she experienced at Lane was "severe" or "pervasive." (Mot. Summ. J. at 1-2, 8-13.) The "severe or pervasive" standard is prescribed in order to screen from trial those sexual harassment lawsuits that, if permitted to go to trial, would effectively turn federal and state anti-harassment legislation into general workplace civility codes. Oncale, 523 U.S. at 81. In order to differentiate between potentially meritorious suits involving severely or pervasively hostile treatment and non-meritorious suits involving basic civility issues characterized by "isolated incidents," "simple teasing" or "mere offensive" behavior, trial judges are expected to use "common sense, and an appropriate sensitivity to social context." Ugurhan Akturk Kosereis v. R.I., 331 F.3d 207, 216 (1st Cir. 2003). The court is expected to consider all of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 524 U.S. at 787-788 (quoting Harris, 510 U.S. at 23). Thus, although questions regarding the severity or pervasiveness of harassment are ordinarily reserved for the factfinder when a plaintiff's evidence presents even a borderline case, Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir.2002), "summary judgment is an appropriate vehicle for 'policing the baseline for hostile environment claims.'" Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006) (quoting Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*)).

Pastula argues that there can be no question on this record but that she found the work environment to be abusive.  She notes that she broke down and cried when talking with management about what had happened.  Assuming that Pastula has enough evidence to prove the subjective component of the legal standard, the real hurdle in this case is whether the facts suffice to establish an objectively hostile or abusive environment.  On this question, Pastula marshals the evidence as follows:

> It seems obvious that a reasonable person would find two repeated requests by a supervisor to "flash your tits" to be offensive.  Then, having been told that the offender would be relieved of duty, instead the offender went unpunished and Ms. Pastula was transferred to a different crew where the hostile environment not only continued but worsened.  Mark Rowley made the statement 20-30 times that day, to Ms. Pastula and others, that "we're not going to have titty Tuesday, we're going to have pants down Wednesday."  Mr. Rowley came up with new humiliating comments on a regular basis, and not a day would go by without someone making a crude remark.  Even the supervisor of that crew, Steve Rowley, made sexual and degrading comments about whether the crew had "gotten any skin" the night before. . . .  Ms. Pastula worked with that crew from August 6, 2003 to September 2, 2003, a period of four weeks, and endured those comments on a daily basis.  Only after Ms. Pastula reported the harassment to DOT officials and those officials called Lane did Lane investigate and again, rather than punishing the harassers, Lane transferred Ms. Pastula to a different position.  Shortly thereafter, Ms. Pastula was put back on Jeff Albee's crew and was forced to ride separately to the job site and endure the ostracism of her co-workers.  In the summer of 2005, Ms. Pastula again complained of sexual harassment in conjunction with the party at Erin Brown's house and statements made and repeated by the general foreman and her crew foreman in the wake of that party, yet nothing was done in response to her complaints and Ms. Pastula was forced to continue working with the offenders for over a month thereafter.  A reasonable factfinder may find that Ms. Pastula's workplace was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

(Id. at 7-8.)  In subsequent remarks, Pastula focuses her argument by contending that the collection of comments about "moon us Monday," "titty Tuesday," and "pants down Wednesday" were specifically directed at her in light of what was known by Mark

Rowley to have occurred to Pastula on Albee's crew.  (Id. at 9 (arguing that these comments "followed the pattern of the original 'titty Tuesday' comment and thus were specifically directed at Ms. Pastula and her complaints about Mr. Albee's remark").)  I agree with Pastula that there is a fair inference of a connection between the initial "flash your tits" statement by Albee and the subsequent "moon us Monday" and other comments by Mark Rowley.  Nevertheless, from an objective standpoint, I reject Pastula's assertion that her work environment "worsened," in terms of sexual harassment, following the transfer to Steve Rowley's crew.  Albee's request that Pastula expose herself to the crew was a targeted statement made directly to her in a public context and was the most offensive utterance that she ever experienced in the workplace.  In contrast, the statements made by Rowley were in the nature of general workplace banter and teasing.  The same applies to Rowley's subsequent queries to the crew about "getting any skin."  In effect, although Pastula's five-week sojourn with Steve Rowley's crew involved a more steady diet of remarks, they were at most "mere offensive utterances" that cannot fairly be characterized as abusive, intimidating or even humiliating, from an objective standpoint.[13]  Following these episodes, the record reveals nothing other than the utterance of a solitary, second-hand statement made by a drunken supervisor about a third party.  That utterance was separated from the earlier utterances by more than a year's time during which Pastula worked on her original crew without incident.  No reasonable person could fairly find that that isolated event independently rose to the level of severe sexual harassment or combined with the earlier events to give rise to a workplace

---

[13]     Pastula has neither pled nor asserted a sexual harassment retaliation claim.  Possibly, that is because the Rowley brother who made the utterances was not her supervisor.  In any event, I have not applied the Title VII retaliation standard articulated in Burlington Northern & Santa Fe Railway v. White, 548 U.S. __, 126 S. Ct. 2405, 2409, 2417 (2006).

pervaded by sexual harassment.  In summary, following an uneventful period of two-to-three years on the job, Pastula endured a collection of offensive utterances over the course of roughly five-to-six weeks that caused some turmoil in her work experience, but were followed by another long, uneventful period.  Viewed objectively, the collection of offensive utterances that Pastula endured were not sufficiently serious to support a finding that Lane Construction Corporation subjected her to severe or pervasive sexual harassment in the workplace such as could reasonably be regarded as having effectuated a change in the terms and conditions of her employment.

**B.      The Ellerth/Faragher Defense**

Lane also argues that, even if Pastula has a triable sexual harassment claim, it is entitled to judgment as a matter of law that it exercised "reasonable care to prevent and promptly correct sexually harassing behavior" and that Pastula "failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm." (Mot. Summ. J. at 13-14, citing Pa. State Police v. Suders, 542 U.S. 129 (1st Cir. 2004).)  This is an invocation of the Ellerth/Faragher affirmative defense that applies to actions under Title VII.  See Suders, 542 U.S. at 137-38, 145-46 (discussing Faragher v. Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998)).  As an affirmative defense, it is the defendant employer's burden to demonstrate that it applies.  Id. at 146.  Pastula argues, first, that the defense has no application under the Maine Human Rights Act.  In her view, the MHRA makes employers strictly liable for the actions of supervisors, even when the actions that supervisors take are unauthorized and not perpetuated by any desire to serve the interest of the employer. (Pl.'s Opp'n Mem. at 10-11.)  Alternatively, Pastula argues that genuine issues of material

fact preclude an application of the defense at the summary judgment stage and that the defense does not apply because the transfer to Steve Rowley's crew was an adverse employment action.  (Id. at 12-18.)

I see no reason why the Court need make any ruling on any of the arguments related to the Ellerth/Faragher defense because the record does not support the sexual harassment/hostile work environment claim in the first place.  In the event that the Court disagrees, however, the record developed in the parties' summary judgment statements does not really lend itself to an application of the Ellerth/Faragher defense because there was no pattern of prolonged harassment by any supervisor.  Pastula reported the "flash your tits" utterance the day after it occurred and no subsequent harassment by Albee is evident in the record.  Even if there were continued harassment by Albee, which there clearly is not, Lane cannot establish on this record that Pastula failed to exercise reasonable care to avoid sexual harassment by Albee, which is the second, *necessary* element of the defense.  Marrero v. Goya of P.R., Inc., 304 F.3d 7, 20 (1st Cir. 2002).  Similarly, neither the offensive utterance made by Steve Rowley about "getting any skin" nor the much later utterance by Owen Powers were actionable sexual harassment and neither was followed, in any event, by any future offensive utterances by these "supervisors."  As for the numerous utterances from Mark Rowley, he was not Pastula's supervisor and the Ellerth/Faragher defense is designed to address vicarious liability for supervisor harassment, not co-worker harassment.  Suders, 542 U.S. at 143 n.6[14]; Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 85-86 (1st Cir. 2006).

---

[14]     Lane cites only Suders to support its affirmative defense and makes no reference to the legal standard for imposing vicarious liability on employers for co-worker harassment.

C.        **The Maine Whistleblower Protection Act**

In her second count Pastula claims that Lane violated the Maine Whistleblower

Protection Act by transferring her to Steve Rowley's crew in order to retaliate against her

for blowing the whistle on Albee's offensive utterance.  Lane argues that it is entitled to

summary judgment because Pastula did not suffer any adverse employment action and

because retaliatory animus did not motivate its decision to move her to Steve Rowley's

crew.  (Mot. Summ. J. at 16.)

"Section 4572(1)(A) of the [Maine Human Rights Act] makes it illegal for an

employer to discriminate against an employee in retaliation for the employee's exercise of

rights under the Maine Whistleblowers' Protection Act (WPA or MWPA)," 26 M.R.S.A.

§§ 831-840.  Higgins, 194 F.3d at 261; see also 26 M.R.S.A. § 4572(1)(A).  "The

MWPA, in turn, protects an employee from discrimination when he has complained to

the employer in good faith about a workplace-related condition or activity that he

reasonably believes is illegal, unsafe, or unhealthy."  Higgins, 194 F.3d at 261 (citing 26

M.R.S.A. § 833(1)(A)-(B)).  In order to set forth a prima facie whistleblower claim, "an

employee must show (1) that she engaged in activity protected by the WPA, (2) that she

experienced an adverse employment action, and (3) that a causal connection existed

between the protected activity and the adverse employment action."  DiCentes v.

Michaud, 1998 ME 227, ¶ 14, 719 A.2d 509, 514; accord Blake v. State of Maine, 2005

ME 32, ¶ 7, 868 A.2d 234, 237; Stanley v. Hancock County Comn'rs. 2004 ME 157,

¶ 11, 864 A.2d 169, 173 -74.

To demonstrate the occurrence of an adverse employment action Pastula asserts

that she was transferred to a different crew with "a significant loss in pay."  (Pl.'s Opp'n

Mem. at 18.)  She refers here to her alleged loss of hours while working on the Steve Rowley crew rather than the Albee crew.  I agree with Pastula that the loss of either hours or an overtime opportunity would be sufficient evidence of a material adverse employment action because even temporary transfers leading to adverse work hour changes and pay changes are deemed sufficient to generate a genuine issue of material fact on the existence of a materially adverse employment action.  See, e.g., Keeton v. Flying J, Inc., 429 F.3d 259, 263 (6th Cir. 2005) (distinguishing as non-adverse those employment measures that are only temporarily enforced and then rescinded before any "tangible" harm arises); Roberts v. Principi, No. 2:02-CV-166, 2006 U.S. Dist. LEXIS 40686, *8 n.4, 2006 WL 1696726, *3 n.4 (E.D. Tenn. June 16, 2006) (finding that "the lost opportunity to sign up for overtime is sufficient to establish an adverse employment action").  However, I do not agree with Pastula that she has generated a genuine issue as to the loss of income.  As Lane argues (Def.'s Reply Mem. at 6), Pastula has only presented evidence that she averaged more income during a nine-week period on the Albee crew as compared with her stint on Steve Rowley's crew.  I do not agree with Pastula that this kind of evidence would justify a reasonable factfinder drawing an inference that Pastula suffered a loss in pay.  In order to establish a sufficient record for that kind of inference, Pastula would need evidence showing the number of hours that the Albee crew worked during the period that she was on Steve Rowley's crew.  Without some such evidence, I conclude that her mere assertion that she was losing hours will not support a finding that the transfer to Steve Rowley's crew was a material adverse employment action.

As for the causal connection between the transfer and Pastula's alleged whistleblowing, Pastula says that element is established because Lane "does not dispute that Ms. Pastula's complaint was the reason for her transfer."  (Pl.'s Opp'n Mem. at 18.) Lane replies that the "causal connection" element is really a discriminatory animus element.  (Def.'s Reply Mem. at 5, citing Fennell v. First Step Designs, Ltd., 83 F.3d 526 (1st Cir. 1996).)  I agree.  The MHRA affords a traditional retaliation claim to protect whistleblowers, among others.  MHRA retaliation claims are subject to the familiar McDonnell Douglas[15] burden-shifting paradigm used by federal courts to determine whether there is sufficient circumstantial evidence of discriminatory intent to justify a trial.  Doyle v. Dep't of Human Servs., 2003 ME 61, ¶¶ 20-22, 824 A.2d 48, 55-57. Nevertheless, Pastula is correct that her immediate transfer following her complaint is sufficient to set the keystone on her *prima facie* case.  Id., 2003 ME 61, ¶ 21, 824 A.2d at 57 (finding that an adverse employment action in close proximity to protected activity satisfies the third element of the *prima facie* standard).  Whether her showing can carry the burden of demonstrating discriminatory animus is another matter.

If a plaintiff succeeds in establishing her *prima facie* claim, the burden shifts to the defendant "to produce some probative evidence to demonstrate a nondiscriminatory reason for the adverse employment action."  Id., 2003 ME 61, ¶ 20, 824 A.2d at 56 (quoting DiCentes v. Michaud, 1998 ME 227, PP14-16, 719 A.2d 509, 514-15).  "Once that evidence has been offered, the burden remains with the employee to persuade the factfinder that there was, in fact, a causal connection between the protected activity and the adverse employment action."  Id.; see also ¶ 14, 719 at 53-54 ("When a plaintiff lacks direct evidence that an employer's actions were *motivated by discriminatory animus* and

---

[15]    McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

relies instead on circumstantial evidence of discrimination, the burden-shifting framework of McDonnell Douglas . . . applies.") (emphasis added).

Lane has offered probative evidence of a nondiscriminatory reason for the transfer:  it is what Bess thought that Pastula wanted in order to be away from Albee. (Mot. Summ. J. at 17; SMF ¶¶ 21, 26.)  Lane also notes:  "Bess's efforts [to help Pastula] were successful, since when she returned to Albee's crew, she experienced no problems and is now a happy Lane employee. . . .  [I]t makes no sense that such measures could be deemed unlawful retaliatory conduct . . . predicated on discriminatory animus."  (Id. at 17-18.)  In opposition to these assertions, Pastula argues that Lane's failure to promptly punish Albee and its decision to return him to supervisory work after Albee made "additional sexist remarks and an insincere apology" demonstrate that Lane's explanation is a pretext for retaliation.  I fail to follow the logic of this argument.  Pastula has admitted that she asked to be removed from the Albee crew (SMF ¶ 21) and Lane's failure to promptly discipline Albee does not tend to establish that Lane bore any retaliatory animus toward Pastula.  And viewing the totality of the circumstances, it simply cannot be overlooked how, in relatively short order, Lane put its foremen through a supplemental training and had Pastula returned to her original crew, where she endured no further offensive acts or statements from Albee and overheard only one lewd statement (second hand) by a drunken foreman more than a year later.  I conclude that the record would not permit a reasonable factfinder to infer that the transfer of Pastula to Steve Rowley's crew was motivated by retaliatory animus over her complaints regarding Albee.  There simply is no suggestion of retaliation in this record.

### Conclusion

Based upon the foregoing, I **RECOMMEND** that the Court **GRANT** Lane Construction Corporation's motion for summary judgment against both of Pastula's substantive claims.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) (1993) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

October 11, 2006                    /s/ Margaret J. Kravchuk
                                    U.S. Magistrate Judge